UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 06-80535-CIV-RYSKAMP

VISTAR TECHNOLOGIES CORP.,

      Plaintiff,

v.

OREN TAVORY,

      Defendant.

_____/

## DECLARATION OF MYRA AMEIGH IN OPPOSITION TO SUMMARY JUDGMENT

Myra Ameigh declares as follows:

1.      I am Myra Ameigh, a person of lawful age, and competent to make this Declaration. All of the statements in this Declaration are based upon my personal knowledge.

2.      I am the President and CEO of Vistar Technologies Corp. ("Vistar"). I am also the chairperson of the board of directors of Vistar.

3.      This suit was authorized by Vistar. The consent of a majority of the members of the Board of Directors of Vistar was obtained prior to filing this action. In addition, as an officer of Vistar, I personally instructed the attorneys representing Vistar in this case to file this action.

4.      Vistar is a software company. Vistar employs 19 employees and independent contractors. Vistar's primary asset, apart from its dedicated employees

and contractors, is software called the Vistar Imaging Profiler System ("VIP System"), and software modules written to work with the VIP System.

5.     The VIP System is copyrighted.  The copyright is owned by Vistar and was registered to Vistar. At all times the VIP System, related screen displays and documentation have contained copyright notices both on labels and imbedded in the properties of the software that indicate that Vistar is the owner of the copyright in the VIP System.

6.     The Board of Directors and I instructed Vistar's attorneys to file this lawsuit to put a halt to infringement by Tavory of Vistar's copyright in the VIP System, and for a declaration that under the Copyright Act, ownership of the copyright in the VIP System is vested 100% in Vistar.

7.     This suit was precipitated by the defendant's claims at depositions in two cases pending in Palm Beach County Circuit Court[1] that he, not Vistar, is the owner of the copyright in the VIP System.  Tavory's statements asserting ownership in the VIP System were the first such statements Tavory ever made in the history of Vistar. Further acts and statements of the defendant indicated that he was infringing on Vistar's copyright in the VIP System.  A majority of the Board of Directors of Vistar agreed with my assessment that defendant's statements and actions placed Vistar's primary asset in jeopardy.  A majority of the Board agreed that Vistar must take action immediately to

---

[1] The actions are both captioned *Oren Tavory v. Vistar Technologies Corp., et al.*  The first filed action is an individual action by Tavory and bears Case No. 50 2005 CA 0000605 XXXXMB.  The second action is a derivative action by Tavory and bears Case No. 50 2005 CA 009534 XXXXMB.  The

prevent further violation of its rights under the Copyright Act and to preserve Vistar's vital interests in its primary asset, the VIP System.

### Business Operations of Vistar

8.     Vistar is a small company whose 19 employees and contractors are spread out all over the country.  Vistar operates as a "virtual" company in that it has no central headquarters office where the staff reports to work each day.  Most of our employees and contractors work from their homes.  Our sales and support teams travel extensively to meet with clients in cities all over the United States.  Vistar has operated in this fashion since its inception.

9.     An operation such as Vistar's requires constant coordination among members of the team.  Vistar employees and contractors utilize email, cellular telephones and internet telephony to keep in constant contact with each other to make sure we are meeting customer needs.  It is critical for all Vistar employees and contractors to have excellent communications skills in order to bridge the long distances between us so we can understand each other and work together as a team.

10.     Vistar is a healthy and profitable company.  Vistar's June 2006 financial statements for the first half of the year reflect that VISTAR had gross revenue of over $750,000.00, almost twice that of the same period last year.  A true and correct copy of VISTAR's financial statements for the first half of 2006 is attached hereto as Exhibit "1".

---

defendants in both actions are Vistar, Myra Ameigh, and Kathy Barber. The actions will be referred to as the "Palm Beach County Actions."

11.     I have managed the day-to-day operations of Vistar from the time it was founded in 1997, and I have held the title of president and CEO of Vistar since 2000. Since its inception I have overseen the entire sales, marketing, product design, customer support, business planning, accounting, human resources, and administrative functions of the company.  I have executed almost all corporate and legal documents on behalf of Vistar, including most contracts, correspondence, and corporate tax returns.

12.     Defendant Tavory is Vistar's former Vice President and Chief Information Officer (CIO).  Until his termination on December 27, 2005, Tavory was responsible for Vistar's software programming and source code compiling, quality assurance, support and maintenance, disaster recovery, continuity of service, and technology infrastructure.

13.     Tavory held the official title of president for the first several years from Vistar's incorporation, after which I took over the title.  Even though he had the title of president, Tavory's responsibilities during this early period were focused on programming and compiling Vistar's software, while I managed Vistar's day-to-day operations, product design, sales and marketing.

### The Formation of Vistar

14.     Vistar Technologies Corp., was formed for the purpose of developing and licensing software.  In 1996, Tavory and I agreed to form a software company and that we would own equally.  We worked together previously at a software company called Engineered Business Systems, Inc. ("EBS").  At the time we started working together in

our own company, Tavory was working for DHL, and he also had his own company called A Better Way Software, Inc.

15.    Tavory and I both had prior experience in the software business. However, when we started Vistar we had no software to sell. All we had were ideas about types of software we might produce with technologies we were familiar with from our work together at EBS. In particular, we thought it was important to include imaging technology in our software so that users could view images of scanned paper documents on the screen while also manipulating data about those documents.

16.    Initially, Tavory and I were unsure about what particular market we would target for the software we planned to create. I investigated and met different potential clients. I suggested the health care industry because I had observed its many inefficiencies during the weeks and months I spent in the hospital with my newborn daughter who was very ill at birth.

17.    Tavory and I funded Vistar out of our own pockets from the very beginning. We each contributed a minimal amount of cash for expenses related to operations. Our primary contributions were our sweat equity, knowledge and experience. We each supported ourselves from our own funds until Vistar began to earn enough so we could pay ourselves a salary.

18.    Oren and I together worked as equal partners to start Vistar Technologies. Even though Tavory had a separate company called A Better Way Software, Inc., I never worked for that company. We initially called our new company "Interact

Software." We met in the evenings and on weekends while Tavory worked at DHL during the daytime.

19.     I used my contacts to obtain our first client.   We both paid company expenses and were reimbursed later once the company had cash.   When we could afford to pay salary in 1998, we paid each other equally.   After operating as Interact Software for a few months we changed the name to Vistar.

## Vistar's Incorporation

20.     Vistar was incorporated on January 27, 1997.   Gerald Schilian, Esq. ("Schilian") assisted Vistar with the incorporation.   Oren Tavory was the incorporator.   In its first annual report filed with the Florida Secretary of State, Vistar listed 2 officers and directors.   Tavory was listed as president, and Ameigh was listed as treasurer.   A true and correct copy of the 1998 annual report is annexed hereto as Exhibit "2".

21.     At the time Vistar was incorporated I was under a non-compete with EBS. Schilian reviewed the non-compete and we discussed our new business with him. Schilian told us that he did not think that the business of Vistar would violate my non-compete with EBS.   However, to be on the safe side, Tavory and I agreed that Tavory would be the incorporator and would be listed as president even though, in reality, I would be performing the functions of president.

22.     Article V of Vistar's Articles of Incorporation ("Articles") provides that the **initial** Board of Directors would include two directors.   The Board of Directors is not

6

limited to two persons, and there is no limit as to the number of directors that can be on the Board of Directors of Vistar.

23.     Pursuant to the Articles, Vistar has only one class of no par stock.  There is no delineation between voting stock and non-voting stock or preferred stock and common stock.

24.     At the time that Vistar was incorporated no stock was issued and no stock certificates were prepared or delivered to Tavory or myself.  Tavory and I did not pay any money for any stock in Vistar.  There was no consideration given for stock in Vistar.

## Vistar's Initial IRS Filings

25.     On or about March 1, 1997, Tavory and I filed an IRS Subchapter S Election Form 2553 in which we indicated that we were 50/50 owners of Vistar.  We did not refer to any specific number of shares.

26.     In 1997, K-1's were issued to Tavory and me by Vistar.  These K-1's were attached to the 1997 1120S Federal Corporate Income Tax Return for Vistar. The K-1's reflect that Tavory and I were each 50% owners of Vistar in 1997.  Accordingly, I filed my 1997 Individual 1040 Income Tax Return and paid taxes consistent with having a 50% ownership interest in Vistar.  Richard Pollock, C.P.A., a childhood friend of Tavory, prepared Vistar's 1997 corporate return and has prepared all of Vistar's corporate returns from 1997 through 2004.

## First aborted attempt at a shareholders' agreement

27.     In 1997, Tavory and I explored the possibility of entering into a shareholders' agreement.    In July 1997, Schilian prepared a draft "Shareholders' Agreement of Vistar Technologies Corp."   A true and correct copy of the 1997 draft Shareholder Agreement is attached hereto as Exhibit "3" and incorporated herein by reference.

28.     Tavory and I did not finalize the shareholders' agreement.   The draft shareholders' agreement reflects that we each owned 100 shares of Vistar.   No shareholders' agreement for Vistar has ever been entered into since then.  Signing a shareholder's agreement was never a condition precedent for ownership of stock in Vistar.

## Vistar's first effort

29.     I began work on our software system by creating specifications for the system.  After researching and documenting specifications, Tavory and I would prepare examples of what a few of the screens of the user interface could look like.

30.     Tavory did not begin by writing source code.   The screens we created performed no functions other than to show what the screen could look like to a potential client.   We used the screens in a customer presentation we did, but we were not hired for that job.

### Vistar meets Barber

31.     In February of 1997, Tavory and I met Kathy Barber while working for Vistar. Barber was introduced to us by a potential customer.  At the time, Barber was consulting for a company called Atlantic Health Network, Inc. ("Atlantic").  Barber had training and experience in medical management and credentialing.  She began to assist us in the development of Vistar and introduced us to potential clients.

32.     We showed Barber the screens we developed and then used them to do a successful presentation to Atlantic.  Atlantic agreed to license a future system. With Barber's help, we then began to develop a software system to support credentialing.  Eventually, Atlantic paid for a license for the system we developed.  The system we developed became the VIP System, Vistar's primary asset.  A true and correct copy of Vistar's contract with Atlantic is annexed hereto as Exhibit "4".

33.     The contract with Atlantic provides that Vistar "has developed, owns and has the right to distribute" the software being licensed.  The VIP System ended up looking nothing like the screens we had used for the presentation.

34.     Based on her experience, Barber was able to provide direction and input to us as to what a well rounded credentialing system would need.  Tavory and I had no prior knowledge of medical credentialing before meeting Barber, and Tavory had never designed a software program for health care before.  However, by combining Barber's knowledge and experience in medical credentialing, with our experience in software

development and sales, we thought we could develop a profitable software product that met the credentialing needs of the health care industry.

35.     After our successful work for Atlantic, Barber introduced us to a number of potential clients including Janet Fain of Jupiter Hospital, Becky Watson of St. Luke's Hospital in Jacksonville, Carol Shaw of Shands Hospital in Gainesville, Holy Cross Hospital, and LGR in State College, Pennsylvania.  Vistar began to experience success in the health care software business due in large part to the assistance of Barber.

### Barber becomes a 15% shareholder of Vistar

36.     On or about March 1998, Barber, Tavory, and I individually and/or on behalf of Vistar agreed that Barber would become a 15% owner of Vistar as of that date.  Barber, who had already invested a year of her time to help develop Vistar, agreed to give up her credentialing business, accept reduced compensation, and work full time with Vistar in order to be a 15% owner of Vistar.  Her ownership status became effective at that time.

37.     From that point forward, Barber, Tavory and I would receive equal salaries, but our dividends would be based upon our respective ownership interests, to wit: Ameigh 42.5%, Tavory 42.5%, and Barber 15%.  Barber's ownership status was not conditioned on any event nor was it conditioned on the execution of a shareholders' agreement.  Barber has been a 15% owner/shareholder since March 1998.

## Board of Directors of Vistar

38.     Since on or about March of 1998, Ameigh, Tavory, and Barber have been the shareholders and owners of Vistar.   Since then we have represented to our employees, our customers and the government that the three of us are the shareholders and owners of Vistar.  We have entered into contracts, hired employees, set salaries and year end bonuses, and managed the day to day business operations of Vistar together as shareholders since 1998.  Beginning in March 1998, Tavory, Barber, and I acted as a de facto Board of Directors of Vistar.

39.     For the majority of Vistar's history the board of directors operated informally.  Vistar is a small corporation and the directors were usually able to conduct the day-to-day business of Vistar in an informal manner without the need for formal meetings, meeting minutes or written resolutions.   The members of the board of directors acted informally and personally conducted Vistar's business.

## Annual report filings of Vistar

40.     Annual reports have been filed with the Florida Secretary of State for Vistar every year since 1998.  The reports filed for every year after Barber became a shareholder list Barber as an officer and secretary/treasurer of Vistar. Attached hereto as Exhibits "5", "6", "7", "8", "9", "10", "11", and "12" are true and correct copies of the Vistar's annual reports for 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 respectively.

### Vistar pays dividends to all three shareholders according to their ownership interests

41.     Shortly thereafter, on April 8, 1998 and April 9, 1998, the first dividend checks were issued by Vistar to Barber, Tavory, and myself, to wit: Barber $65.00 - 15%, Ameigh $184.00 - 42.5%, and Tavory $184.00 - 42.5%. The dividend checks were paid to the parties consistent with Barber having a 15% ownership interest in Vistar. Continuing every year from that point until the present, all parties received dividend checks from Vistar according to this formula. Tavory and I have co-signed and approved every dividend check dispersed to the three owners from 1998 through September 2005. Tavory never objected to Barber receiving a dividend check from April 1998 through September 2005.

42.     Dividends have been paid by Vistar to its shareholder every year since 1998. Attached hereto as Exhibits "13", "14", "15", "16", "17", "18", "19", "20" and "21" are true and correct copies of dividend checks for 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 respectively. The checks reflect that all dividends were paid according to the percentage ownership interest of the three shareholders: Ameigh 42.5%, Tavory 42.5%, and Barber 15%.

43.     Included among the dividend checks for 2005 are checks from a special dividend issued at Tavory's request so he could purchase an automobile. Pursuant to his request, on September 1, 2005, Vistar issued an aggregate dividend of $60,000.00 according to the percentage ownership interest of the three shareholders: Ameigh

12

42.5%, Tavory 42.5%, and Barber 15%. Tavory did not object to Barber receiving this dividend.

### Tavory repeatedly confirms dividends are paid based on ownership interest

44.     Over the course of many years Tavory, Barber and I communicated on numerous occasions by email concerning the payment of dividends. Vistar's bookkeeper, Lisa Hillis, also communicated with the three shareholders regarding dividend payments. Each and every email communication regarding the payment of dividends confirms both the status of Barber as a shareholder, and the division of ownership of Vistar according to the agreed upon percentages of 42.5 percent - Ameigh, 42.5 percent - Tavory, 15 percent - Barber.

45.     Throughout his entire association with Vistar, and until November 2005 when the Palm Beach County Actions were filed, Tavory never objected to the payment of a single dividend to Barber. Moreover, there have never been any conditions or qualifications imposed on any owner regarding their receipt of dividend checks.

46.     Attached hereto are the true and correct copies of the following emails between Tavory, Barber, Ameigh and Hillis that confirm ownership through a discussion of dividends:

       a.      Barber's email to Hillis copied to Tavory and Ameigh dated December 1, 2003 requesting a "3 way split dividend against $125,000.00," (annexed hereto as Exhibit "22");

13

b.     Emails dated June 23 and 24, 2004 between Tavory, Ameigh, Barber and Hillis regarding a dividend issued to all three shareholders to pay for insurance which calculated and apportioned the dividend according to the shareholders' ownership interests (annexed hereto as Exhibit "23");

c.     Ameigh's email to Hillis dated September 29, 2004 referring to the issuance of a dividend to pay quarterly income tax payments, and an email from Hillis to Tavory and Ameigh dated September 28, 2004 referring to a dividend apportioned according to the shareholders' ownership interests that would allow Barber to pay for her insurance, (annexed hereto as Exhibit "24");

d.     An email dated February 8, 2005 from Barber to Hillis copying Ameigh and Tavory requesting Hillis issue a dividend to all three shareholders in the aggregate amount of $125,000.00 "per percentages", (annexed hereto as Exhibit "25");

e.     Tavory's email to Ameigh, Barber and Hillis dated March 23, 2005, and Hillis' email to Ameigh, Tavory and Barber of the same date, regarding dividend payments to all three shareholders to pay taxes, (annexed hereto as Exhibit "26");

f.     Tavory's email to Ameigh and Barber dated June 9, 2005, in which he stated he had "no issue" with a request by Barber for a dividend of $5,000, and which also contained a reminder from Tavory that a dividend would also be needed so the shareholders could pay their taxes (annexed hereto as Exhibit "27");

g.     An email from Ameigh to Tavory and Barber copying Hillis dated August 8, 2005 containing a projection of the three shareholders' total income tax

14

liability and suggesting a dividend "to be distributed by our ownership percentages," (annexed hereto as Exhibit "28");

    h.    Barber's email to Ameigh and Tavory, copying Hillis regarding Tavory's request for dividend in the net amount to him of $25,000.00 in order so Tavory could purchase a car which would require a total dividend of $60,000.00 "split per our normal distribution (42.5, 42.5 and 15 percent)", (annexed hereto as Exhibit "29");

    i.    An email from Hillis to Tavory, Barber and Ameigh dated September 2, 2005 containing an analysis of Vistar's cash reserves, and referencing total dividends paid out to the three shareholders year to date, both in the aggregate and divided according to each shareholder's percentage ownership, (annexed hereto as Exhibit "30");

    j.    Ameigh's email to Tavory dated September 2, 2005 following up on Hillis' cash analysis, and agreeing to Tavory's request for a dividend so Tavory could make a down payment on a car (even though I felt, based upon cash reserves, that such a dividend may be unwise), (annexed hereto as Exhibit "31"); and

    k.    An email from Ameigh to Tavory and his counsel, Vistar's counsel and Barber copying Hillis dated September 3, 2005 discussing Tavory's demand for an additional dividend so he could purchase a car, despite the fact that $150,000.00 in dividends had been paid to the three shareholders three weeks ago, and confirming that a smaller dividend would be issued than Tavory requested to preserve cash flow, (annexed hereto as Exhibit "32").

15

## Facts about Tavory dividends

47.    The March 23, 2005 email Tavory sent to Hillis (attached as Exhibit "26") is notable because it contains a mathematical formula for computing dividend amounts to be issued to all three shareholders to allow them to pay their income taxes.  This email is extraordinarily detailed about how dividends should be computed.  This email indicates that Tavory spent time and effort to devise his dividend formula.  The dividend formula confirms Barber's shareholder status and the percentage ownership of each shareholder.  Tavory's formula is consistent with our respective ownership interest as reflected in all of Vistar's 1120S corporate tax returns and K-1's since 1998.  Furthermore, Tavory calculated each party's tax payment based on the 2004 dividends that each of us had received to date that year.  Tavory specified that Barber has a 15% ownership interest and that Tavory and I have a 42.5% ownership interest each, which is consistent with the 1998 through 2004 corporate tax returns and K-1's for Vistar.

48.    The September 2005 dividend that Tavory requested so he could purchase an automobile is notable because it demonstrates Tavory's inconsistent behavior in 2005. Tavory did not object to Barber receiving this dividend, even though two months before for the first time he claimed she was not a shareholder.

49.    Since the inception of Vistar in 1997, Vistar has paid Tavory over $850,000 in dividends.  Barber has received slightly more than $300,000 in dividends since she became an owner.

### Vistar's IRS Filings

50.     Consistent with Barber becoming an owner in 1998, Vistar filed 1120S Federal Corporate Income Tax Returns for the years 1998 through 2004 and K-1's showing each party's respective ownership interest, to wit: Ameigh 42.5%, Tavory 42.5%, and Barber 15%.   Tavory's childhood friend Pollock prepared all of Vistar's 1120S Federal Corporate Income Tax Returns from 1997 through 2004.

51.     Every single 1120S and K-1 prepared by Pollack and filed for Vistar from 1998 through 2004 reflects that the ownership of Vistar was Ameigh 42.5%, Tavory 42.5%, and Barber 15%.   Attached hereto as Exhibits "33", "34", "35", "36", "37", "38"and "39" are true and correct copies of the 1120S and K-1 forms filed with the IRS by Vistar for 1998, 1999, 2000, 2001, 2002, 2003 and 2004 respectively.

### Annual Meetings at Accountant's Office

52.     Since Barber became a 15% owner in Vistar, Tavory, Barber and I almost always attended an annual meeting at Pollock's office to prepare Vistar's corporate tax returns.  As with our other meetings, the annual meeting was an informal event.  Since Barber became an owner in 1998, the percentage ownership interests for the parties reflected in the corporate tax returns have not changed: Ameigh 42.5%, Tavory – 42.5%, and Barber – 15%.   Tavory never objected to or imposed any conditions on Barber's 15% ownership interest at our annual meetings with Pollock..

17

**My individual tax returns reflect a 42.5% ownership interest**

53.     Consistent with Vistar's 1120S Federal Corporate Income Tax Returns and the K-1's, I filed 1040 Federal Individual Income Tax Returns for the years 1998 through 2004 based on the K-1's.  As with all personal and corporate federal income tax returns, they were signed under penalty of perjury.  I paid income taxes on my personal returns consistent with Vistar K-1's and my respective ownership interest of 42.5% from 1998 through 2004.  Attached hereto as Exhibits "40", "41", "42", "43", "44", "45" and "46" are true and correct copies of my IRS 1040 forms for 1998, 1999, 2000, 2001, 2002, 2003 and 2004 respectively.

**The VIP System**

54.     The VIP System is a comprehensive software solution with a primary focus in credentialing for the managed care sector of the health care industry.  The VIP System is the principal asset of Vistar.  The VIP system was created by Vistar through the efforts of all of its officers, employees and contractors, not just Tavory .

55.     The VIP System is registered with the U.S. Copyright Office, reg. no. TX-6-340-855 issued May 23, 2006.  Registration TX-6-340-855 covers the entire VIP System computer program, text of user manuals and related screen displays.  A copy of Registration TX-6-340-855 is attached to the Amended Complaint in this matter.

56.     The VIP System was architected, written, developed, tested and compiled entirely by employees and consultants to Vistar at Vistar's expense.  The VIP System is the result of many years of development, refinement, and improvement by Vistar and its

consultants based upon Vistar's trade secret knowledge, testing and use in real world conditions by Vistar and its customers.

57.     Any and all contributions made by Tavory to the development of the VIP System were, at all times, for Vistar as an employee, officer, director, and shareholder of Vistar.  Vistar owns all of the rights comprised in the copyright to the VIP System, and has never assigned those rights. Vistar was TAVORY's employer or other person for whom the VIP System was prepared, and Vistar is the author of the VIP System.  Vistar and TAVORY have never expressly agreed otherwise in a written instrument signed by them or verbally.

58.     All of Vistar's licensing agreements with its clients assert that Vistar is the owner of the VIP System.  For example, a "Vistar Imaging Profiler System Agreement" dated October 1, 1998 between Vistar and Phymatrix  provides that Vistar "has developed, owns and has the right to distribute a certain computer software system known as 'The V.I.P. System."  The agreement with Phymatrix was signed by Tavory on behalf of Vistar.  A true and correct copy of the agreement with Phymatrix is annexed hereto as Exhibit 46A.

59.     Tavory has always agreed that Vistar owned the VIP System. Tavory never contested this fact in any way until the Palm Beach County Actions were filed.

60.     A majority of Vistar's licensing agreements contain a clause relating to source code escrow.  See, for example, the agreement with Phymatrix, Ex. 46A, section 2(a)(iii).  The clause provides that it the customer pays an extra fee, one copy of the

source code for the VIP System will be placed in escrow with a mutually agreed upon software escrow company. A source code escrow account provided insurance that that in the unlikely event Vistar filed for bankruptcy or failed to maintain and update the software as promised, the software source code would be released to the client. The fact that escrow was available made the VIP System attractive to large customers who might otherwise be unwilling to do business with a small company like Vistar.

### From the beginning, Tavory hijacked the VIP System source code

61.     Even though Tavory never contested Vistar's ownership of the VIP System, throughout his association with Vistar, TAVORY engaged in a course of conduct where he maintained exclusive control of the source code for the VIP System. Tavory hijacked the source code and refused to allow anyone else to have meaningful access to it. In order to run a software program a user needs a version of the program that is "executable" on their system. However, software source code is not written in executable form. Instead, in order to have an executable version of a software program a software programmer needs to "compile" the source code. In order to compile an executable program one must have all of the different pieces of source code that make up the program on one computer.

62.     The VIP System source code was written in a computer language specific to the Sybase® PowerBuilder® development environment. In order to compile an executable program for software developed in PowerBuilder®, one must have all of the different pieces of PowerBuilder® source code on one computer.

63.    Typically, when several software developers are collaborating on a software program, as was the case for the VIP System, a Source Configuration Management (SCM) system will be installed on a central computer server and accessible to all developers.  Software developers then "check out" parts of the source code to work on it, and then "check in" finished source code modules when they are done.  The use of a SCM allows all the developers to access the most up-to-date components of the software at any time. An SCM also allows any developer to compile an executable program using the newest components.

64.    Despite numerous demands, Tavory refused to implement a SCM for the VIP System.  TAVORY refused to provide others with access to all the components of the source code for the VIP System.  TAVORY never provided any other developers, employees or contractors of Vistar with all components of the system at one time.  Despite the fact that he was not the only developer to add or modify source code components, TAVORY maintained exclusive control over the VIP System source code.  The result was that only TAVORY had access to the most current version of the VIP System at any time. Other Vistar developers had to submit code they wrote to Tavory to incorporate or compile to update the executable version. This process was time-consuming and resulted in guessing and rewrites to make the new code work with other areas of the system.

### Tavory's moonlighting

65.     From its inception it was obvious that Vistar was not Tavory's sole source of income.   While Tavory did not provide me with details of the software projects he worked on while employed by Vistar, it was not a secret that he also worked on software projects "on the side."  He filed annual reports for A Better Way Software, Inc. to keep it in good standing with the Florida Secretary of State from 1996 through 2001.   Then in 2002 he dissolved the company and instead became an officer and director of A Better Way/Oren International Travel Service, Inc., a company that had previously been owned and operated by Tavory's mother and family.   According to the Secretary of State, Tavory is still and officer and director of that company today.

66.     As a result of Tavory's moonlighting, it was often difficult to contact him and get him to cooperate on Vistar's projects.   Over the years many Vistar employees complained that Tavory was unreachable at important times.   Tavory was also consistently late with delivering work product.  This made getting work done difficult for a company like Vistar.

### Second aborted attempt to enter into a Shareholders' Agreement

67.     On April 15, 1999, one year after Barber became an owner and received her first dividend check, another meeting was held with Schilian to discuss a potential shareholders' agreement.   Prior to the meeting, Tavory circulated an "Agenda List" of issues to discuss at the meeting.  The first item on the agenda under "immediate issues" concerned the escrow of the VIP System software source code.  The second item on

the agenda concerned a shareholders' agreement, which is couched as a "partnership agreement." The agenda contains a list of 58 different issues for discussion and potential inclusion in such a "partnership agreement." None of the issues concern Barber not being a shareholder. One issue on the list is "Kathy non voting %." A true and correct copy of the "Agenda List" is annexed hereto as Exhibit "47".

68. All three shareholders attended the meeting on April 15, 1999. Schilian took notes during this meeting regarding the numerous issues the parties wanted to address in the shareholders' agreement. Schilian advised us that each of us would have to have our own individual legal counsel to represent us in the negotiations.

69. At the time of this meeting, Barber had been a 15% owner of Vistar for over a year without any objection from Tavory. At no time during this meeting did Tavory challenge Barber's status as an owner or shareholder.

### Third aborted attempt to enter into a Shareholders' Agreement

70. I have always been in favor of entering into a shareholder's agreement with Tavory and Barber provided the agreement was fair to all the shareholders and protected Vistar. Therefore, I continued to discuss this issue with the other shareholders. It was important to me that any shareholder's agreement permit a sale of Vistar or its assets in the future so that all the shareholders could realize a return on the significant investment of time and money they had made over many years. I communicated my position to Tavory on a number of occasions while at the same time I

23

expressed my serious concern about his refusal to deposit the source code for the VIP system into escrow in accordance with our license agreements.

71.     In furtherance of the discussions regarding a shareholders' agreement, Vistar retained David Bates, Esq., of Gunster, Yoakley to represent the corporation. Tavory searched out and found Mr. Bates and suggested him to me and I retained him on Vistar's behalf.   A meeting was scheduled for May 13, 1999 to discuss a shareholders' agreement with Bates.

72.     All three owners attended this initial meeting with Bates.  At no time during this meeting was Barber's status as a current owner challenged by Tavory.  Rather, the meeting focused on Tavory's refusal to give up control of the source code for the VIP System without a shareholders' agreement.

73.     About one year before the meeting with Bates, Vistar had entered into a software license agreement with  Phymatrix.  Phymatrix demanded the agreement included an  escrow clause to have Vistar place the VIP System source code in a software escrow account with a third party escrow agent. Tavory fully agreed to add an escrow clause to our license agreement. However, Tavory never put the source code in escrow.

74.     Tavory, Barber and I all agreed that VIP System source code belonged to Vistar.   However, every time I requested Tavory deposit the source code for the VIP System in escrow he refused to comply and instead disregarded Vistar's obligations under its license agreements.  Instead, Tavory insisted that he would not release the

24

source code and deposit it in escrow unless all the shareholders entered into a shareholders' agreement. Because of Tavory, Vistar was in breach of license agreements with its customers.

75. After the meeting, Bates sent us a memorandum dated May 13, 1999 containing an outline of terms of a shareholders' agreement discussed at the meeting. The memorandum makes no mention of Barber's shareholder status or whether her shares are voting or non-voting. A true and correct copy of Bates' memorandum is annexed hereto as Exhibit "48".

76. Thereafter, emails were circulated between us discussing terms that could be agreed to in a shareholders' agreement. On August 22, 1999, Tavory e-mailed Ameigh and Barber and provided a list of terms we discussed. At no time did Tavory question Barber's shareholder status or indicate that Barber's ownership was contingent on the execution of a shareholders' agreement. Attached hereto as Exhibit "49" is a true and correct copy of the email with attachments.

77. Attached to the August 22, 1999 e-mail was a "Summary of Items to be Written Into Partnership Agreement" ("Summary of Items") prepared by Tavory. Tavory's summary provided for "unanimous" vote among the three shareholders. The Summary of Items makes no reference to "non-voting stock." The Summary of Items also includes a reference to Barber's ownership percentage in discussing key man life insurance under paragraph 4.b. "Myra and Oren will receive 2 million-dollar policies,

25

while Kathy receives a $706,000.00 policy. Amounts are based on ownership %." This again confirmed Barber's status as a shareholder.

78.     I objected to several items in Tavory's Summary of Items. On August 23, 2000 I sent an email to Tavory in which I expressed my concern, on behalf of Vistar, that Tavory's refusal to deposit the VIP system source code in escrow violated 26 contracts between Vistar and its clients which state that Vistar will deposit the source code in escrow, as well as two third-party escrow agreements, the beneficiaries of which were clients, that also required escrow deposit of source code. In my email I also expressed my concern to Tavory that his refusal to deposit the VIP system source code in escrow was a violation of his fiduciary duties to Vistar. The email demanded Tavory deposit the source code in escrow immediately. A true and correct copy of my email dated August 23, 2000 is annexed hereto as Exhibit "50".

79.     A follow-up meeting was held with Mr. Bates on September 23, 1999. The meeting was held at Mr. Bates' office. Vistar was represented by Mr. Bates at the meeting. Barber was represented by Jerri Blaney, Esq. Tavory was represented by Howard Nadel, Esq. I represented myself.

80.     At no time during the meeting was Barber's status as a 15% shareholder challenged by Tavory. Instead, the discussion focused on the control, not ownership, of the VIP System source code.

### Tavory used the hijacked source code as leverage

81.     The meeting at David Bates' office was acrimonious.  During the meeting Kathy Barber and I insisted that Tavory release the full source code for the VIP System so it could be deposited in escrow. In response, Tavory's counsel stated that while it was clear that the source code for the VIP System belonged to Vistar and was Vistar's property, Tavory would not turn over the source code to Vistar unless the parties agreed to a shareholders' agreement, or Vistar went to court and obtained a judicial order requiring Tavory to do so.

82.     It was clear to me at the meeting that Tavory was using his exclusive control of the full source code as leverage to advance his own self interests.

83.     The parties were unable to agree on the specific terms of a shareholders' agreement at the meeting.   Therefore, we continued operating Vistar without any shareholders' agreement.

### Further attempts to facilitate a shareholders' agreement

84.     Discussions regarding a shareholders' agreement continued.  On October 19, 1999, I sent an email to Tavory and Barber that attached a document entitled "Myra's Contract Issues."   The document made no mention of Barber's shareholder status or whether her shares are voting or non-voting.   Tavory did not raise any objections to Barber's shareholder status or voting rights in response.   A true and correct copy of my October 19, 1999 email and the document attached is annexed hereto as Exhibit "51".

27

85.     On December 2, 1999 I sent another email to Tavory and Barber regarding a potential shareholders' agreement.  The email attached a document entitled "Shareholder's Agreement Terms and Conditions."  The document made no mention of Barber's shareholder status or whether her shares are voting or non-voting.  Tavory did not raise any objections to Barber's shareholder status or voting rights in response.  A true and correct copy of my December 2, 1999 email and the document attached is annexed hereto as Exhibit "52".

## Letter to FHC Systems

86.     On February 21, 2000, I prepared a letter to Dr. Ronald Dozoretz of FHC Systems, which was submitted to Tavory and Barber for their review and comment. Tavory did not object to the letter, which I signed as President of Vistar and which opens with the following statement:

> As you requested, below is a summary of Vistar Technologies Financial indicators.  Please note we are a Chapter S corporation with three shareholders.

Tavory never objected to this letter.  A true and correct copy of the February 21, 2000 letter is attached hereto as Exhibit "53" and incorporated herein by reference. Over the years, I have publicly submitted many proposals, requests for proposal responses and created a corporate prospectus which detailed Vistar Technologies' corporate status and three shareholders. Tavory never objected or disputed these facts. Tavory was always in complete agreement.

## Software Escrow Agreement and Addendum

87.     In the spring of 2001, Tavory finally agreed to place the source code for the VIP System in escrow without a shareholders' agreement. However, the form software escrow agreement provided by Fort Knox Escrow Services, Inc. ("Fort Knox"), Vistar's software escrow agent, was unacceptable to Tavory because under the agreement the VIP system source code could be withdrawn from escrow by Vistar without Tavory's consent. This was unsatisfactory for Tavory. Tavory insisted that an addendum be attached to the escrow agreement that would require unanimous consent to withdraw the software source code from escrow.

88.     In the course of discussing the language of this addendum, Tavory sent an email dated March 28, 2001 to Barber suggesting specific language he had drafted be included in the addendum. The email states:

> Hi Kathy:
>
> What do you think of this language???
>
> 4.      Whenever any action, communication, or source code access is required by the Producer, it shall require the three signatures of Myra Ameigh, Oren Tavory and Kathy Barber (the "Owners"); In the event that any one of the Owners dies or becomes medically incapacitated for a prolonged period the remaining Owners shall be permitted to access the source code for the sole purpose of continuing to support licensee(s).

A true and correct copy of Tavory's email is annexed hereto as Exhibit "54".

89.     On May 4, 2001 Tavory, Ameigh and Barber signed the addendum to software escrow agreement.   A true and correct copy of the addendum is annexed hereto as Exhibit "55".

90.     The addendum contained substantially the same language suggested by Tavory in his email dated March 28, 2001.  The addendum referred to Ameigh, Tavory and Barber as Owners.   The addendum prohibited the release of source code from escrow without the express written consent of Ameigh, Tavory and Barber.    The addendum required that notice be given under the agreement to Ameigh, Tavory and Barber.  The addendum contained the signatures of Ameigh, Tavory and Barber.

91.     Tavory signed the Software Escrow Agreement with Fort Knox that the addendum amended.  Tavory signed the agreement as "Vice-President."  A true and correct copy of the software escrow agreement is annexed hereto as Exhibit "56".

92.     Upon signing the software escrow agreement in May of 2001, Tavory made one source code deposit into escrow.  Thereafter, Vistar continued to develop, update and refine the VIP system.   However, Tavory never deposited any of the updated or revised versions of the software in escrow until 2005, even though Vistar's contracts required it to always be up to date and have the latest version of its software in escrow with Fort Knox.  I continually urged Tavory to make deposits every time Vistar received a bill for escrow services and paid its annual fee, but Tavory failed to do so.

93.     Vistar was provided with history reports on a regular basis by Fort Knox showing its source code deposits.  Every time I received one of these reports it showed

no deposits had been made since May of 2001. Every time I received one of these reports I contacted Tavory and instructed him to make a deposit. Every time he failed to do so.

**Vistar's Proposal to the Coalition for Affordable Quality Healthcare**

94.    On April 6, 2001 Vistar submitted a response to a request for proposal issued by the Coalition for Affordable Quality Healthcare ("CAQH"). Vistar's proposal was prepared with the participation and consent of Tavory.

95.    Page 2 of the proposal describes the composition of Vistar and states it is a Florida S corporation operational since 1997 with three stockholders, Ameigh, Tavory and Barber. The proposal states Ameigh and Tavory were the primary stockholders until 1998 when Barber was added as a stockholder, and that "[t]hese three individuals have collaborated to build and promote the Vistar Imaging Profiler System...." The proposal also contains biographical information on all three shareholders. Tavory reviewed the proposal and never objected to any of its contents. A true and correct copy of Vistar's response to CAQH's request for proposal is annexed hereto as Exhibit "57".

**The decline in quality of the VIP System**

96.    Beginning in 2004, Vistar's customers began to experience an unusually high number of software failures with the VIP System. Tavory and I had many communications regarding these problems. I told everyone at Vistar that it was a

31

priority for all employees and contractors who worked on software development and testing to help resolve these problems as quickly as possible.

97.     By this time Vistar's customer base had grown substantially. Along with this growth, Vistar had hired or contracted with several additional software developers. As CIO, it was Tavory's responsibility to supervise these developers and coordinate their work. It also continued to be Tavory's responsibility to write software. However, the quality of Tavory's software was no longer sufficient to meet the requirements of Vistar's customers. The size of Vistar's average customer had grown, and the demands on its software had increased, but the VIP System had failed to keep pace.

98.     During 2004 it became apparent that Tavory's software development, operations and management skills and methods were unsuited to a growing operation like Vistar. For example, Tavory still had not implemented a Source Configuration Management (SCM) system. This meant that while a number of software developers were collaborating on the development of the VIP System at the same time, none of them could be sure they had the most up-to-date version of the software they were working on. This made debugging the software a tedious and drawn-out process for the entire development team. Tavory also refused to engage in cursory testing and software reviews with developers. This caused VISTAR to waste an extraordinary amount of time and expense to deliver an executable version of the VIP System to customers.

99.     The lack of an SCM also meant that the developers needed to depend on Tavory to email them components of the system whenever they needed them. If Tavory

was not responsive to their requests, or sent them the wrong files, they would be unable to complete their work in a timely fashion. This happened frequently.

100.   At the same time Tavory became increasingly removed from the operations at Vistar.  He was not available for long periods of the day and did not respond to clients and the development staff in a timely manner.  Vistar hired additional staff to do Tavory's work.  However, the lack of an SCM meant that the additional staff experienced the same frustrations of not being able to complete their work in a timely manner or respond to support issues in a timely manner.

101.   The cycle of development for the VIP System became longer and longer. Clients became frustrated.  The VIP System became unstable.  The system "blew up" during sales presentations.  Vistar's software developers complained openly about the situation. I raised these problems with Tavory.  We spoke about these issues one-on-one and with other Vistar employees and contractors on many occasions throughout 2004. During these conversations I made clear that Vistar's software development operations needed to mature just as the rest of Vistar had, and that positive change was required.

102.   However, Tavory refused to change.  Instead, Tavory became disruptive and combative.  Tavory refused to implement a SCM for the VIP System.  TAVORY refuse to provide others with access to all the components of the source code for the VIP System at the same time.  It became clear to everyone that TAVORY's policy of

33

maintaining exclusive control over the VIP System source code was preventing Vistar from functioning.

### Fourth aborted attempt to enter into a shareholders' agreement

103.   In July of 2004, Tavory again raised the issue of a shareholders agreement.   In response, on July 15, 2004, I sent an email to Tavory and Barber requesting Tavory forward his first draft of an agreement.  I indicated I would be "glad to put in my comments and requirements" and that "I am happy to proceed with a partnership agreement."  A true and correct copy of my July 15, 2004 email is annexed hereto as Exhibit "58".

104.   This fourth attempt at a shareholders agreement also did not result in an agreement between the parties.

### Vistar's Prospectus

105.   In the fall of 2004, Vistar created a prospectus as part of its efforts to create interest among potential purchasers of Vistar.  All the shareholders agreed that it would be in their best interests to explore a possible sale of Vistar.  Vistar's prospectus was prepared with the participation and consent of all the shareholders, including Tavory.

106.   Page 7 of the prospectus describes the company as a privately held Florida S corporation with three owners/operators, Ameigh, Tavory and Barber.  The prospectus also contains biographical information on all three shareholders.  Tavory

34

reviewed the prospectus and never objected to any of its contents. A true and correct copy of the fall 2004 Vistar prospectus is annexed hereto as Exhibit "59".

107. The idea of selling Vistar was not new. Rather, all three shareholders had discussed the idea every year since 1999. However, we never took any concrete steps towards such a sale. Beginning in 2004, Vistar began contacting various investment bankers to obtain help with a sale of the company.

108. In May of 2005, Barber and I met with an investment banking firm. Tavory was supposed to attend the meeting but canceled at the last minute. All three owners had a telephone meeting with the investment banking firm and we all agreed to meet in person to discuss our options further.

109. In August of 2005, we received a proposed agreement from the investment banking firm of Milliburn Capital/Healthcare Growth Partners, Inc. to provide financial advisory services to Vistar and circulated it among the shareholders. Tavory objected to the agreement and refused to sign it.

### Tavory fails to maintain source code escrow

110. On January 4, 2005 I received a source code deposit history report that showed escrow had not been updated since May of 2001. I sent an email to Tavory dated January 4, 2005 informing him of this fact and advising him that because Vistar had failed to deposit its source code in escrow it was in violation of most of its software licensing agreements. I once again instructed Tavory to correct this and make an immediate deposit of source code into escrow, and specifically referenced version

4180m of the VIP System as being the version to deposit so Vistar could come into compliance with its legal obligations. A true and correct copy of my email dated January 4, 2005 is annexed hereto as Exhibit "60".

111. My January 4, 2005 email also noted that Tavory was the only "Owner" who possessed all of the source code for the VIP System in order to comply with Vistar's escrow obligations. Despite Vistar's demand, Tavory failed to deposit the most up to date version of the VIP system source code with Fort Knox.

112. Thereafter, Vistar was contacted by a customer regarding its source code escrow account. The customer had inquired and discovered that the version on deposit was an older version than the one that they had licensed from Vistar. In response, Tavory made another source code deposit. However, I later learned that the source code he deposited was not the most current version at the time that the deposit was made. In fact, the source code deposit Tavory made was code that was two years old at the time.

## Concerns about disaster recovery and continuity

113. Tavory's failure to maintain source code escrow deposits created concern not only because Vistar was in violation of its agreements with its customers, but also because it indicated that Tavory was lax in performing other important functions that were critical to Vistar's day to day operations. Specifically, I was concerned about two other areas within Tavory's scope of responsibility as Chief Information Officer, (1) disaster recovery, and (2) continuity of service and preparedness.

114. Because of this concern, Vistar had an information technology consultant with extensive industry experience to develop a plan to address disaster recovery and continuity of service and preparedness for Vistar. As a result of the consultant's work, it was clear that Tavory had failed to perform many of the important functions required of him by Vistar as its Chief Information Officer.

### Tavory's unprofessional behavior with clients

115. As Chief Information Officer, Tavory played an important role in software development and support. Tavory was not involved in sales except to support Vistar's sales executives with product information, provide new features, or to answer questions. Tavory's contact with customers was similarly confined to software support issues.

116. Beginning in 2005 however, on several occasions Tavory injected himself into the sales process with disastrous results. In one case, I requested Tavory provide answers to technical questions in order to respond to a request for proposal from an important potential client. I gave Tavory a deadline that had been given to me by the potential client. In response, Tavory not only failed to provide the requested information, but accused me of lying about the deadline and threatened to call the potential client. In another case, Tavory misrepresented the functionality and purpose of a software module written by another Vistar developer when Tavory spoke with a potential client. Vistar was able to correct the situation, but Tavory's misrepresentations almost cost Vistar a sale.

117.    When dealing with clients regarding support matters, Tavory also began to behave in an unprofessional and destructive manner.  During one support call, Tavory cursed on the telephone in front of the client and two employees.  On another call, Tavory failed to provide the client with an available solution to its problem and, as a result, the client questioned the reliability of Vistar's products.

### Vistar's employees and contractors demand change

118.    By May of 2005, Vistar's many loyal employees and contractors were complaining openly on a regular basis about Tavory.  The complaints were about the lack of a coherent management system for VIP System development, the inability to contact Tavory at critical times, and Tavory's unprofessional behavior, to name a few.  At the same time, Tavory's failure to deposit source code in escrow, implement a disaster recovery plan, or provide for continuity of service was threatening Vistar's survival.

119.    Tavory continued to refuse to make changes on his own. Vistar could not afford to lose its many talented, valuable employees and contractors.  It was vital that Vistar be able to continue to serve its clients.   It was my fiduciary duty to the shareholders of Vistar to make sure that Vistar continued as a going concern and prospered in the months and years ahead.

120.    I decided that as President and CEO I needed to formalize corporate governance of Vistar in order to resolve the situation with Tavory.

### Vistar Board actions confirm Barber's shareholder status

121.    On July 15, 2005, Vistar sent an "Action without Meeting of the Shareholders of Vistar Technologies Corp." affirming that the Board of Directors of the Corporation consisted of Tavory, Barber and I, and that I would continue as Chairman of the Board.  This action passed upon the consent of the majority of the shareholders of Vistar and became effective on July 22, 2005.  A copy of the July 15, 2005 board action is annexed hereto as Exhibit "61".

### August 12, 2005 board meeting of Vistar

122.    On August 2, 2005, as President and Chair of the Board, I sent a "Notice of Special Meeting of the Board of Directors of Vistar Technologies Corp." to Ameigh, Barber, and Tavory.  The meeting was noticed for August 12, 2005.  The matters to be considered at the meeting were the adoption of corporate by-laws, affirming the officers of Vistar, adoption of the proposal of Milliburn Capital/Healthcare Growth Partners, Inc. to provide financial advisory services to the Corporation, adoption of a corporate plan for continuity of service disaster recovery and back-up procedures, company wide for all company information, adoption of proposal for life insurance coverage for officers, and other business as the board may choose to consider.  A true and correct copy of the Notice is annexed hereto as Exhibit "62".

123.    On August 12, 2005 Vistar's Board of Directors held its meeting at the office of its counsel, Gerald Schillian pursuant to the August 2nd Notice.  Ameigh and

Barber attended as did Tavory and his counsel. Attached hereto as Exhibit "63" is a true and correct copy of the minutes of the August 12, 2005 meeting.

124. At the meeting I raised the issue of Tavory's failure to deposit the source code for the VIP system in escrow on a regular basis. I noted that the source code version in escrow was not the most current version as of that date. Tavory responded that he had updated the source code deposit, but admitted that the version in escrow was not the current version. Instead, the version in escrow was a version that was current at the time in the past when a Vistar client, Medical Mutual of Ohio, requested the escrow be updated.

125. I informed Tavory this was not acceptable. At the meeting, the Board of Directors voted and approved a resolution requiring Tavory to update the source code escrow.

126. With regard to disaster recovery, and continuity of service and preparedness, I asked Tavory, as Chief Information Officer, how he had prepared Vistar to provide continuity of service, and how Vistar would operate in the event of a disaster. Tavory was asked what, if anything, he had done as CIO in order to provide for disaster recovery and continuity of service.

127. In response, Tavory indicated that the only provision that had been made for continuity of service was the escrow deposits of source code which were not up to date. With respect to disaster recovery, he indicated he maintained a computer server

only he had access to, and that he backed this server up. However, he refused to provide information on the frequency or procedures he followed for backup.

128. Because of Tavory's reliance on source code escrow for continuity of service, the Board requested he provide written documentation of his escrow deposits including dates and version numbers. Tavory responded that this would be difficult since there was a new version every day, but agreed to provide a detailed report and a plan for disaster recovery and continuity of service within 15 days, and implement that plan within 30 days. He agreed to include in this report the versions of the VIP system used by Vistar's clients, and the versions that had been deposited in escrow. Tavory never produced this report.

129. Finally, the fact that the source code for the VIP system is owned by Vistar was discussed at this meeting. I reminded Tavory that Vistar owns the source code. I told Tavory that Vistar is entitled to possession of the source code so that it can ensure service to its customers can continue in the event something unforeseen happened to Tavory or in the event of a disaster. At no time during this meeting did Tavory assert any ownership rights in the source code. At no time during this meeting did Tavory indicate that he had an ownership right to maintain exclusive possession of the source code.

130. After the meeting I sent Tavory a memorandum dated August 16, 2005, outlining the requirements imposed by the board of directors for a disaster recovery and continuity of service plan. I also sent Tavory a separate memorandum dated August 16,

2005, outlining the source code escrow deposits that were necessary. True and correct copies of both memoranda are annexed hereto collectively as Exhibit "64".

131.    Thereafter, I emailed Tavory and reminded him that he was required to provide his plan for disaster recovery and continuity of service within 15 days, and to implement the plan within 30 days. Thereafter, on August 30, 2005 I again emailed Tavory and asked whether he would submit a plan for disaster recovery and continuity of service as agreed at the August 12, 2005 Board meeting. Again, on August 31, 2005 I emailed Tavory and asked whether he would be complying with the Board's direction to provide a disaster recovery and continuity of service plan. A true and correct copy of these emails is attached hereto as Exhibit "65". Tavory never produced or implemented an acceptable plan for disaster recovery and continuity of service.

### Vistar Board issues stock certificates

132.    On September 23, 2005, an Action Without Meeting of the Board of Directors of Vistar Technologies Corp. was sent to Ameigh, Barber, and Tavory. The Action stated that the Board of Directors of the Corporation hereby issue stock certificates in accordance with the percentage of the corporation each shareholder owns, to wit: Ameigh (425 shares), Tavory (425 shares), and Barber (150 shares). The Action was ratified by the affirmative vote of the majority of the Board of Directors on or about September 27, 2005. A true and correct copy of the Action without Meeting of the Board of Directors of Vistar Technologies Corp. with proof of delivery is attached is attached hereto as Exhibit "66".

133.   Following the September 27, 2005 approval of the Action, Vistar issued stock certificates to me, Barber, and Tavory. Barber's stock certificate reflects that she owns 150 shares of stock in Vistar. My stock certificate reflects that I own 425 shares of stock in Vistar. Tavory's stock certificate reflects that he owns 425 shares of stock in Vistar.

## Tavory attempts to sabotage Vistar's operations

134.   After Vistar was formed in 1997, it opened a bank account at BankAtlantic. BankAtlantic was Vistar's only bank. Vistar paid its bills, its nineteen employees and contractors from this BankAtlantic account. All Vistar revenues were deposited into this account. Plaintiff and I were both signatories on the BankAtlantic account.

135.   It was Vistar's general practice to pay its bills twice a month and payroll once a month in the beginning of the month. Tavory and I co-signed company checks to pay Vistar liabilities each month.

136.   Beginning in September, 2005, Tavory began to threaten to freeze Vistar's bank accounts. Tavory told Vistar bookkeeper Hillis in the presence of another employee, Lisa Dye, that he would not sign any more checks and he was going to freeze Vistar's bank account. I asked Tavory to cooperate and meet about these threats so that Vistar could continue to meet its obligations to its creditors and employees. However, he refused, even if the nonpayment of the obligations would have a negative impact on Vistar.

137. On October 6, 2003, Tavory filed the first of the Palm Beach County Actions against me, Barber and Vistar. Tavory also stepped up his interference with Vistar in a manner that threatened its ability to sustain normal operations. Tavory refused to sign a check for Vistar's American Express bill for over $18,000.00, claiming that there were personal expenses of mine on that bill. These charges were for travel expenses related to the board meetings, but in an effort to protect the company, I paid the company for the charges. Even though, I offered to personally pay for those expenses, Tavory continued to refuse to sign the check, even though Vistar would sustain injury if this corporate expense was not paid on a timely basis. In addition, Tavory unilaterally, and without Vistar's knowledge redirected a Vistar credit card to his home address.

138. As a result of Tavory's refusal to allow the corporation to pay its bills, and his threats to freeze the corporate account, on November 8, 2005, the Board of Directors of Vistar passed a Resolution Without Meeting of the Board of Directors of Vistar Technologies, Corp. authorizing Kathy Barber to sign Vistar checks, adding her as a signatory on Vistar's accounts, and removing Tavory as a signatory. This resolution was passed by the Board of Directors to continue the normal business operations of Vistar. By his actions Tavory had put the future of Vistar at risk, to further his own agenda, and did not act in the best interests of Vistar's customer, employees and shareholders.

44

139.     Tavory intentionally and repeatedly, contacted BankAtlantic claiming he was the president of Vistar and instructed the bank to freeze Vistar's accounts. Eventually, BankAtlantic complied and put a halt to processing Vistar's checks for several months.  Vistar's operations practically came to a standstill while the company attempted to restore account access and return to normal operations.

140.     Barber and I personally funded Vistar's operational expenses and contractor expenses during this time period from our own pockets in order to keep the company operating. Ultimately BankAtlantic closed Vistar's account and Vistar was forced to bank elsewhere. Vistar incurred thousands of dollars in costs and legal fees in connection with its unsuccessful attempts to unfreeze its BankAtlantic account, transfer funds to a new account, print new checks, change records and resolve a myriad of problems caused by Plaintiff's actions.

141.     On December 19, 2005, Tavory attempted to unilaterally terminate Lisa Hillis as the independent bookkeeper for Vistar.  Tavory had no authority to fire Hillis. Firing Hillis would disrupt the normal operations of Vistar, and Tavory lacked a reasonable basis to terminate Hillis.

### The 2005 hurricane season

142.     Once again, 2005 was an especially busy hurricane season in South Florida and Palm Beach County especially.  Since Vistar was a virtual operation with employees and contractors dispersed all over the country, the hurricanes should not

have had a significant impact on Vistar. However, Tavory lived and worked out of his home in Lake Worth, Florida.

143. Tavory maintained all of Vistar's technology infrastructure at his home, including Vistar's core software development computer server that housed the full set of source libraries. Tavory never established a redundant facility to store Vistar's VIP System source code. Tavory and only Tavory had access to the most up-to-date version of the source code. Prior to the storm I demanded Tavory send the full back-up of the code and customer support data base to our office in Tennessee to be loaded to a server that appropriate staff can access. Tavory refused. As a result, when electricity, telephone service and internet access were shut down because of the hurricanes, the work of other employees of Vistar in different parts of the country not effected by hurricanes ground to a halt. Vistar unnecessarily lost nine days of access to our support database and had to do redundant manual work to track activity. Vistar was also without a reference database of support issues during this time. .

144. When this occurred repeatedly I tried to contact Tavory to make other arrangements so that our employees and contractors could have access to the resources under his sole control. When I did I discovered that Tavory either did not have current backups of the VIP System source code that he could supply to the other developers, or he refused to do so. I also discovered that Tavory had placed Vistar's software development server in the trunk of his car and was driving around with it in there for weeks from place to place to get away from the hurricanes. With no back-up

or redundancy, this meant that if something happened to Tavory or the server Vistar would suddenly be left without its main asset, its software.

## Tavory's termination

145.  On December 22, 2005 I sent a letter to Tavory demanding he deposit complete source code libraries that can be compiled, for Version 4212q of the VIP system into escrow.  I once again noted the requirements in contracts between Vistar and its clients concerning escrow deposit, as well as the fact that several clients were beneficiaries to escrow agreements which required the deposit of up to date source code.  I also informed Tavory that his failure to protect Vistar with an industry acceptable disaster recovery and continuity of service plan needed to be remedied immediately.  I also informed Tavory that his failure to set up a development environment with industry standard source code management procedures needed to be remedied immediately.  The letter also raised other matters which needed to be resolved such as (a) Tavory's interference with the routine payment of Vistar expenses by, among other things, contacting Vistar's bank to stop payment on checks for legitimate expenses, Tavory's refusal to sign checks for legitimate expenses, Tavory's incurring unexplained charges on a Vistar corporate American Express account, as well as other unexplained and seemingly improper expenses submitted for reimbursement; (b) Tavory's harassment and threats of termination against Vistar employees and independent contractors; (c) Tavory's intentional interference with and attempts to sabotage Vistar's relationships with its clients; and (d) Tavory's repeated

representations to third parties that he is president, CEO or chairman of the board of Vistar. A true and correct copy of my letter dated December 22, 2005 is annexed hereto as Exhibit "67".

146. After my letter of December 22, 2005 I received an email from Tavory that indicated he had no intention of remedying any of the concerns raised in my letter. As a result, my letter dated December 27, 2005 Tavory was terminated.

147. As an employee of Vistar, Tavory had access to sensitive and specialized proprietary information including, but not limited to, computer software program source code, trade secrets, and customer information which are the property of Vistar. Tavory also had access to designs, specifications, formulas, algorithms, patterns, compilations, programs, devices, methods, techniques and process that derive independent economic value from not being generally known and not readily ascertainable by others, including, but not limited to, the VIP System source code.

148. Tavory was instructed to return all Vistar equipment, software and materials, including the source code for the VIP system, to Vistar immediately. A true and correct copy of my letter dated December 27, 2005 is annexed hereto as Exhibit "68".

149. To date, Tavory has not returned any of the items listed in my letter.

## Tavory purports to terminate Vistar's "license" to the VIP System

150.   On or about June 15, 2006, defendant sent an email message to Ameigh

and Barber.  The message states:

> From: "Oren Tavory" <otavory@mindspring.com>
> To: <mameigh@vistartech.com>
> Cc: <kbarber@vistartech.com>
> Sent: Thursday, June 15, 2006 4:31 PM
> Subject: Termination of license
>
> Myra and Kathy:
>
>     In light of the circumstances surrounding the current litigation between
> me, you, and Vistar I am terminating Vistar's permission to use or
> sublicense the software Vistar Imaging Profiler, which I own.   This
> termination is effective immediately.  If you would like to have discussions
> or negotiations with me regarding the licensing of this software please
> contact my attorney Don Conwell. Please make arrangements to return to
> me all copies of such software in you possession, custody, or control.
>
> Oren Tavory

A true and correct copy of Tavory's email is annexed hereto as Exhibit "69."

151.   Plaintiff denies and contests defendant's position.  Vistar is 100% owner of

the VIP System computer software program.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Date: 10/17/06

Myra Ameigh